## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

————————————

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                 No. 07-CR-1244 WPJ

DONALD SCOTT TAYLOR, et. al.,

      Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY THE PROCEEDINGS BECAUSE THE GRAND JURY AND PETIT JURY VENIRES WERE NOT DRAWN FROM A FAIR AND REPRESENTATIVE CROSS SECTION OF THE COMMUNITY

THIS MATTER comes before the Court on Defendant Taylor's Motion to Dismiss or, in the Alternative, Stay the Proceedings (Doc. 499). Specifically, the Defendant argues that the jury selection process used by the District of New Mexico violates his rights under the Fifth and Sixth Amendments of the U.S. Constitution and the Jury Selection and Service Act by systematically excluding Hispanics, African Americans, Native Americans and men. He asks this Court to dismiss the indictment against him because the Grand Jury was not comprised of a fair and representative cross-section of the community. In the alternative, he asks this Court to stay the proceedings until the District of New Mexico develops a more inclusive jury plan. Having considered the parties' briefs and the applicable law, the Court DENIES Defendant's motion.[1]

————————————

[1] The Court denies the Defendant's motion without a hearing because the Defendant has failed to put forth specific, nonconjectural facts suggesting that the jury selection procedure actually resulted in substantial underrepresentation of minority groups or that the procedure

## COMPOSITION OF GRAND AND PETIT JURIES

The Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* ("JSSA"), requires each district court to devise a plan for the selection of grand and petit juries.  In accord with the JSSA, the District of New Mexico devised and adopted a written plan for jury selection.  The 2008 Jury Plan divides the state of New Mexico into three petit jury divisions (the Northern, Central and Southern Divisions) and two grand jury divisions (the Northern/Central Division and the Southern Division).[2]  Every two years, a Master Jury Wheel is created by selecting at least 3,000 names—1,000 from each of the three petit jury divisions—at random from voter registration lists.  Next, the Clerk randomly selects names from each division on the master wheel and sends those persons both a juror qualification form and a general summons to report for grand or petit jury service for a two-month term.  The qualification forms ask potential jurors to identify their gender, race and ethnicity among other things.  When the forms are returned, the Clerk of Court

systematically excludes these groups from jury venires.  *See United States v. Ruiz-Castro*, 92 F.3d 1519, 1527 (10th Cir. 1996) (overruled on other grounds).

[2] Under the 2003 Jury Plan, which is also relevant to this case, the three petit jury divisions were the Albuquerque/Santa Fe Division, the Las Cruces Division, and the Roswell Division.  The two grand jury divisions were the Northern Division (composed of the counties in the Albuquerque/Santa Fe petit jury division) and the Southern Division (composed of the counties in the Las Cruces and Roswell petit jury divisions).

dismisses anyone who is disqualified,[3] exempted[4] or excused.[5]  If a person is qualified and available to serve, then his or her name is added to the Qualified Jury List for his or her division and he or she is expected to report for service pursuant to the summons.  Under the 2008 Plan, new Qualified Jury Lists are created approximately every two months.

In contrast, the 2003 Jury Plan instructed the Clerk to create Qualified Jury Wheels rather than Qualified Jury Lists for each of the three petit jury divisions.  To form the qualified wheels, names on the master wheel were randomly selected to receive a juror qualification form.  Once the qualification forms were returned, the Clerk added the names of each person who was qualified and available to serve to the Qualified Jury Wheel for that juror's division.  Finally, names were drawn at random from the Qualified Wheel and those persons receive summonses for particular grand and petit jury panels.  The 2008 Jury Plan consolidated this process: jurors are now summoned and qualified in a single procedure in lieu of two separate procedures.

This case implicates both the 2003 and 2008 Jury Plans.  The grand jury which returned the superseding indictment against the Defendant in this case was formed pursuant to the provisions of the 2003 Jury Plan, which was in place at the time the grand jury was empaneled.  Taylor was indicted in Las Cruces by a jury selected from the Southern Division (as that division

---

[3] A person is qualified for jury service as long as he or she: (1) is a U.S. citizen at least 18 years of age; (2) has resided in the district at least one year; (3) is able to read, write and understand English enough to fill out the juror qualification form; (4) is able to speak English; (5) is mentally and physically capable; and (6) has no felony convictions or pending charges.  28 U.S.C. § 1865(b).

[4] Active members of the U.S. Armed Forces, members of certain fire and police departments, and certain public officers are exempt from jury service.  28 U.S.C. § 1863(b)(6).

[5] The 2008 Jury Plan stipulates that persons over 70 years of age, persons who have served as a grand juror or petit jury in any federal court within the last two years, and volunteer safety personnel are excused from jury service.

3

is defined in the 2003 Plan).  The petit jury, on the other hand, will be selected pursuant to the provisions of the 2008 Jury Plan which is currently in effect.  The 2008 Plan directs the Clerk to assemble a petit jury from the Qualified Jury List for the Central Division.  This Court, however, chose to forgo this procedure and instead ordered the Clerk to create a Qualified Jury List for this case on a district-wide basis.  (Doc. 228)  The Court decided to draw jurors on a state-wide basis rather than only from the Central Division in order to offer the Defendant and the Government the broadest possible spectrum of qualified jurors on the basis of race, ethnicity and geography.  Furthermore, because the Government had filed notice of intent to seek the death penalty, the Court wanted to avoid any potential problems with jury selection in the event the case received significant pre-trial publicity.  In accord with the Court's order, the Clerk created a Qualified Jury List (identified as Pool # 101091001) for this case based on an initial random draw of 4,000 names on a state-wide basis from the Master Wheel.  With the consent of the parties, the Clerk subsequently narrowed the list to 1,000 persons who were both qualified and available to serve.  This Court then authorized the Clerk to mail a voir dire questionnaire along with instructions to appear to each of the 1,000 randomly selected jurors.

## SIXTH AMENDMENT

The Sixth Amendment guarantees a defendant in a criminal trial the right to an impartial jury drawn from a fair cross-section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 537 (1975).  A defendant does not, however, have the right to a jury of any particular composition and the jury actually chosen need not "mirror the community."  *Id.* at 538.  To establish a prima facie violation of the fair cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the

4

number of such persons in the community; and (3) that such underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duran v. Missouri*, 439 U.S. 357, 364 (1979). Once a defendant makes out a prima facie Sixth Amendment violation, the burden shifts to the government to justify the systematic underrepresentation by pointing to a significant state interest at play. *Id.* at 368. The Court first analyzes whether the Defendant has made out a prima facie case of a Sixth Amendment violation.

**1. Is the Excluded Group "Distinctive"?**

A group is "distinctive" under the first prong of this test if the group has: (1) some quality or attribute which defines or limits the group; (2) a cohesiveness of attitudes or ideas or experiences which distinguishes the group from the general social milieu; and (3) an interest which may not be represented by other segments of society. *United States v. Test*, 550 F.2d 577, 591 (10th Cir. 1976). The Government does not dispute, and there is no question, that Hispanics, African Americans, and Native Americans are distinctive groups in the community. *See United States v. Gault*, 141 F.3d 1399, 1402 (10th Cir. 1998) (noting that Hispanics, Native Americans and African Americans are distinct groups in the community). The Government argues, however, that men do not constitute a distinctive group. While the U.S. Supreme Court has not addressed this question, it has held that women constitute a distinctive group, finding that "women are sufficiently numerous and distinct from men." *Taylor*, 419 U.S. at 531. It stated further that "the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. . . . The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded." *Id.* at 531-32 (quoting *Ballard v. United States*, 329 U.S. 187, 193-94 (1946)).

5

I believe this language tends to show that men qualify as a distinctive group.  Certainly,

persons of the male sex are a well-defined and limited group.  Furthermore, men arguably have a

collective experience of being male which distinguishes them from women.  Finally, just as

women have a "community of interest" which may not be fairly represented by other segments

of society, men too have a shared interest which may not be adequately represented by women.

*But see United States v. Smalls*, 06-cr-2403-RB, slip op. at 10 (D.N.M. Oct. 2, 2008) (finding

that men do not constitute a distinct group based on expert's testimony that men have not been

historically disadvantaged by society and do not tend to form groups for the purpose of

discussing or fostering the issues of men); *United States v. Lujan*, 05-cr-924-RB, slip op. at 9

(D.N.M. Oct. 9, 2008) (same).  Regardless, the Court need not decide this matter here.  Even

assuming that men constitute a distinctive group, the Defendant failed to show that men are

substantially underrepresented in the venires from which the grand jury and the petit jury are

chosen.

**2.  Is the Group Fairly Represented in Jury Venires?**

In order to determine whether these distinctive groups are fairly represented in the jury

venires, the Tenth Circuit has instructed district courts to consider two measures: absolute

disparity and comparative disparity.  *United States v. Orange*, 447 F.3d 792, 798 (10th Cir.

2006).  Absolute disparity is determined by subtracting the percentage of a group in the jury

wheel from the percentage of that same group in the general population.  *Id.* (quoting *United

States v. Gault*, 141 F.3d 1399, 1402 (10th Cir. 1998)).  It is "the starting place for all other

modes of comparison."  *Id.*  Comparative disparity, on the other hand, measures the decreased

likelihood that members of a distinct group will be called for a jury.  It is determined by dividing

the absolute disparity of a group by the percentage of that group in the general population.  *Id.*

6

(quoting *Gault*, 141 F.3d at 1402).  Courts are not concerned with minor disparities; rather, the defendant must show that any disparities are "gross" or "marked."  *Id.*  Specifically, the Tenth Circuit is skeptical that underrepresentation exists where absolute disparities are less than 10 percent.  *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998).  While the Tenth Circuit has recognized the limitations of these measurements—particularly when the underrepresented group has a small population—the Circuit continues to rely on them.  "Absent direct evidence of tampering or purposeful discrimination, we hold that when a court is presented with evidence of comparative and absolute disparities . . . [that] fall within our accepted range, a court need not look further into other statistical methods."  *Orange*, 447 F.3d at 799.

The Defendant has calculated the absolute and comparative disparity numbers for three of the four allegedly underrepresented groups.  In calculating the disparities, however, the Defendant makes a number of methodological errors and problematic assumptions.  First, the Defendant asks this Court to analyze the disparities based on various juror pools and lists other than the actual Qualified Jury Wheels (from which the grand jury was chosen) and Qualified Jury List (from which the petit jury will be chosen).  The Tenth Circuit has repeatedly stated that courts must look to the particular Qualified Jury Wheel (or List) from which jurors were actually drawn in order to analyze jury composition challenges.  *See e.g.*, *Gault*, 141 F.3d at 1402.  Therefore, this Court will not address the Defendant's calculations which are based on pools and lists other than the Qualified Jury Wheels and Qualified Jury List actually used in this case.[6]

---

[6] The Court acknowledges that data from other juror pools and lists may be relevant to the third *Duren* prong—whether the jury-selection process systematically excludes certain groups.  However, under the second *Duren* prong, the Defendant must first show that those groups are grossly underrepresented in the actual jury venires used in this case.

Second, when calculating the disparities for Hispanics and Native Americans, the Defendant assumed that any potential juror who did not answer the race question[7] on the juror qualification form is not Native American and anyone who did not answer the ethnicity question[8] is not Hispanic.  This assumption artificially inflates the disparity numbers for both groups.  Because those jurors did not provide any information on their race and/or ethnicity, the Defendant should have excluded those jurors entirely from his calculations rather than assume that they are neither Hispanic nor Native American.  *See United States v. Gault*, 973 F. Supp. 1309, 1312-13 (D.N.M. 1997) (excluding unidentified jurors because expert statistician testified that it is the standard practice of statisticians to exclude the unidentified category when the focus is on a variable such as race or ethnicity); *United States v. Haworth*, 948 F. Supp. 981, 984 (D.N.M. 1996) (excluding unidentified jurors from the disparity calculations).  Because neither party has provided the correct statistics, however, the Court is constrained by the statistics that Defendant has provided.[9]  Finally, while the Defendant appropriately calculated the disparities using the most recent 2000 Census numbers, he notes that the 2008 Census estimates show an increase in the Hispanic population of New Mexico by about two percentage points and suggests that the 2008 figures may be a more appropriate benchmark.  The Supreme Court has approved the use of

---

[7] Question 10a asks the potential juror to identify his or her race from a list: White, Black/African American, Asian, American Indian, Pacific Islander or Other.

[8] Question 10b asks the potential juror whether he or she is Hispanic or Latino and allows for a yes or no answer.

[9] Tellingly, the research organization retained by the Defendant to calculate the disparities stated: "Among those who answered the ethnicity question . . . on the jury qualification questionnaire, we did not find any instances where the percent Hispanic of a qualified jury wheel, grand jury panel or qualified jury list was significantly below the percent Hispanic of the adult citizen population."

population data from the most recent census, *see Duran*, 439 U.S. at 364-65 & nn. 22 & 24, and

this Court is reluctant to alter those numbers based only on census estimates.  Furthermore, the

Court notes that the 2000 Census numbers for Hispanics may already be inflated, given that

ideally only Hispanics who are qualified for jury service (i.e. who are U.S. citizens with English

competency and sufficient length of county residency) should form the benchmark for the

disparity calculations.  Thus, the Court will analyze the disparities using the 2000 Census data

and the makeup of the Qualified Jury Wheels and Qualified Jury List at issue in this case.

  <u>Hispanics</u>.  The grand jury in this case was drawn from the Southern Division of New

Mexico in accordance with the terms of the 2003 Jury Plan.  The Qualified Jury Wheel for that

division was 31.9 percent Hispanic, while the 2000 Census reported that 36.6 percent of the adult

population in that division was Hispanic.  Therefore, the Defendant's statistics reveal an absolute

disparity of 4.7 percent and a comparative disparity of 12.8 percent.  The 4.7 percent absolute

disparity is far lower than the ten percent that the Tenth Circuit has suggested as a threshold

disparity number.  *See Shinault*, 147 F.3d at 1273.  In fact, the Tenth Circuit has upheld jury

selection procedures which resulted in absolute disparities of up to seven percent.  *Gault*, 141

F.3d at 1402-03.  Furthermore, the disparity here does not even begin to approach the absolute

disparity numbers that the Supreme Court has found adequate to make out a prima facie

violation of the Sixth Amendment.  *See Duren*, 439 U.S. at 365-66 (39.5% absolute disparity);

*Castaneda v. Partida*, 430 U.S. 482, 495-96 (1977) (40% absolute disparity); *Jones v. Georgia*,

389 U.S. 24, 25 (1967) (14.7% absolute disparity).  The petit jury will be randomly selected

from Qualified Jury List # 101091001 whose members were drawn from the entire state of New

Mexico.  Hispanics constitute 32.9 percent of this Qualified Jury List and 35.9 percent of the

total adult population in the state, resulting in an absolute disparity of only 3.0 percent and a

comparative disparity of 8.4 percent.  These disparities are even lower than the disparities calculated for the grand jury.  Because all of the disparity numbers provided by the Defendant fall within the range deemed acceptable by the Tenth Circuit, this Court finds that Defendant has failed to make out a prima facie case that Hispanics are underrepresented in either the grand or petit juries in this case.

Native Americans.  The Defendant has also failed to show that Native Americans are grossly underrepresented in the grand or petit juries.  With respect to the grand jury, Native Americans constitute 1.4 percent of the Qualified Jury Wheel and 1.7 percent of the adult population of that division, resulting in an absolute disparity of 0.3 percent.  For the petit jury, Native Americans constitute 5.2 percent of the Qualified Jury List and 8.7 percent of the adult population, resulting in an absolute disparity of 3.5 percent.  Again, these absolute disparity numbers fall well within the acceptable range.  *See, e.g.*, *Yazzie*, 660 F.3d at 427 (holding an absolute disparity of 4.3 percent for Native Americans insufficient to establish a prima facie case of under-representation).  The comparative disparity numbers of 17.6 percent and 40.2 percent, while larger, also do not show the marked disparity necessary to make out a prima facie claim. In *Shinault*, the Tenth Circuit upheld comparative disparities of 48 percent, 50 percent and almost 60 percent.  147 F.3d at 1273.  The Court also noted that high comparative disparities are less persuasive when they are "distorted by the small population of the . . . minority group[]." *Id.*  That is certainly the case here where Native Americans constitute only 8.7 percent of the population of the entire state.

African Americans.  The Defendant did not provide the Court with any detailed statistics—including absolute or comparative disparity numbers—for African Americans. Because it is not the Court's responsibility to dig up these statistics, the Court holds that the

10

Defendant has failed to make out a prima facie case that African Americans were grossly underrepresented in either the grand or petit juries.

Men.  Finally, the Defendant alleges absolute disparities for men of 4.6 percent and 5.1 percent, and comparative disparities of 9.5 percent and 10.5 percent, for the grand and petit jury respectively.  For the same reasons given above, and assuming that men constitute a distinct group, these numbers are insufficient to make out a prima facie case of a Sixth Amendment violation.

**3. Is Under-Representation Due to Systematic Exclusion of Group?**

Because the Defendant has failed to make the requisite statistical showing for any of the allegedly underrepresented groups, the Defendant's Sixth Amendment claim fails and the Court need not address the third prong of the *Duren* test.  *See Shinault*, 147 F.3d at 1273 (holding that the defendant failed to make out a prima facie test when he could not satisfy the statistical showing required by the second *Duran* element and declining to analyze the third element).  *But see Haworth*, 948 F. Supp. at 986 (stating that even insignificant disparities may rise to the level of a Sixth Amendment violation if the selection process is not neutral).  For the sake of thoroughness, however, and because the Defendant devotes most of his brief to this final issue, the Court will explain why the Defendant has failed to show that either the 2003 or 2008 Jury Plans systematically exclude any of the allegedly underrepresented groups.

In order to show that a group has been systematically excluded from jury venires, a defendant need not show that the exclusion is intentional.  *Duren*, 439 U.S. at 366.  Rather, he need only show that the exclusion is "inherent in the particular jury-selection process utilized." *Id.*  The Defendant strenuously argues that "irrespective of any convoluted statistical analysis" the jury selection process systematically excludes Hispanics, African Americans and Native

11

Americans because it relies exclusively on voter registration rolls to draw potential jury members.  The Defendant urges the Court to require the District of New Mexico to draw potential jurors from a broader and readily available database which includes motor vehicle records (both driver's licenses and identification cards) and New Mexico personal income tax returns as well as voter registration rolls.  As the Defendant concedes, however, the practice of selecting prospective jurors solely from voter registration rolls "has been repeatedly and unsuccessfully challenged."  *See, e.g.*, *United States v. Test*, 550 F.2d 577, 586-87 (10th Cir. 1976); *United States v. Orange*, 447 F.3d 792, 799-801 (10th Cir. 2006).  In fact, this Court is unaware of a single case—and the Defendant has cited none—in which a court has held that the use of voter registration records systematically excludes a distinct group.  The Jury Selection and Service Act ("JSSA") specifically provides that prospective jurors should be selected either from voter registration rolls or the lists of actual voters.  28 U.S.C. § 1863(b)(2).  Additional sources of prospective jurors may be used, but only "where necessary to foster the policy and protect the rights secured by" the JSSA.  *Id.*

The Defendant identifies a number of supposed problems with drawing jurors exclusively from voter registration rolls.  Among other things, the Defendant notes that: (1) voter registration records are often out-of-date and many questionnaires mailed to minority groups are returned as undeliverable because "frequent changes of address tend to be associated with lower income levels"; (2) the plan contains no mechanism for re-contacting jurors who do not return their questionnaires; and (3) members of certain minority groups are less likely to register to vote in the first place.  The Tenth Circuit rejected each of these challenges in *United States v. Orange*, noting that "[d]iscrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*."  447 F.3d at 800.  It continued:

12

"[N]either the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population." *Id.* (quoting *Test*, 550 F.2d at 587 n.8 (collecting cases)).  The Defendant has presented no evidence showing that any of the purportedly underrepresented groups are prevented from registering to vote.  As long as the right to register to vote remains open, defendants cannot criticize the selection process on this basis.  *Haworth*, 948 F. Supp. at 987 (collecting cases).  In addition, the Court notes that it did, in fact, order the Jury Administrator to resend juror qualification forms to the approximately 10 percent of potential jurors who had not responded.  (Doc. 533)  Returns from the first and second mailings resulted in a total overall response rate of 94 percent.  *See* Affidavit of Eduardo Contreras, to be filed as Exhibit 1[10] .

Finally, the Defendant argues that significant geographic disparities exist in the petit jury venires.  Specifically, he alleges that the Southern Division of the state is overrepresented, while the Central and Northern Divisions of the state are underrepresented.  The Tenth Circuit has held that "[m]ere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury panel represent a fair cross section of the community." *Test*, 550 F.2d at 582 n.4.  As discussed above, the Defendant has not put forth sufficient evidence that any cognizable group has been systematically excluded or underrepresented.  Furthermore, the petit jury venire in this case was created by randomly drawing potential jurors from the entire State, with a predetermined number drawn from each county.  In his affidavit attached to the Government's response, the Jury

---

[10] The Affidavit of Mr. Contreras will be filed separately.

Administrator represented that "persons were selected from the counties in each petit jury division in a way so as to ensure that each county was substantially proportionally represented." The Defendant has not rebutted this assertion with any evidence of systematic exclusion of a distinct group.

## FIFTH AMENDMENT

The Defendant also claims that these same jury selection procedures violate his Fifth Amendment right to equal protection of the laws.  While neither party addressed the question of standing, the Court finds that Taylor has no standing to assert an equal protection challenge with respect to Hispanics, Native Americans or African Americans because Taylor is not a member of any of these groups.  As the Supreme Court has held, "[i]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of *his* race or of the identifiable group *to which he belongs*."  *Castaneda*, 430 U.S. at 494 (emphasis added).  *See also Haworth*, 948 F. Supp. at 982-83 (noting that defendants abandoned their Fifth Amendment equal protection claims because they lacked standing because they were not members of the allegedly underrepresented groups).  While Taylor has no standing to assert these claims under the Fifth Amendment, he *does* have standing to assert them under the Sixth Amendment.  *See Taylor*, 419 U.S. at 526 (holding that a defendant need not be a member of the excluded group in order to assert a Sixth Amendment fair-cross-section claim); *Shinault*, 147 F.3d at 1271 (same).

The only equal protection claim Taylor has standing to assert under the Fifth Amendment is his claim that the jury selection procedure results in the substantial underrepresentation of men.  The Fifth Amendment inquiry significantly overlaps with the fair-representation inquiry under the Sixth Amendment.  *See Yazzie*, 660 F.2d at 426 ("While equal protection and fair-

14

cross-section cases are not entirely analogous . . . both violations require a showing of a distinctive group and a substantial underrepresentation of that group in jury venires before a prima facie case is established and the burden of proof shifts.")   Because Taylor was unable to make out a prima facie case under the Sixth Amendment with respect to men, his Fifth Amendment challenge fails as well.  *See, e.g.*, *Gault*, 141 F.3d at 1402 (addressing defendant's Fifth and Sixth Amendment challenges concurrently).

## JURY SELECTION & SERVICE ACT

Finally, the Defendant argues that the jury selection process violates the JSSA's provision directing district courts to enact jury plans which ensure that potential grand and petit jurors are selected at random from a representative cross section of the community.  18 U.S.C. § 1861.  As the Defendant concedes, however, "[b]ecause the Jury Act's fair cross section requirement parallels a defendant's Sixth Amendment right to trial by an impartial jury, the defendant's Jury Act challenge and his constitutional challenge are both evaluated under a Sixth Amendment standard."  *Shinault*, 147 F.3d at 1270. Because the Defendant cannot allege a Sixth Amendment violation, he likewise cannot allege a violation under the JSSA.  Furthermore, the JSSA specifically requires each district to draw jurors initially from voter registration rolls or actual voter lists.  While it permits districts to supplement with information from other sources, "[t]he supplementation of voter lists is the exception, not the rule, and absent a showing of deficient representation the use of an approved jury selection process is lawful."  *United States v. Bennett*, 539 F.2d 45, 55 (10th Cir. 1976).

## CONCLUSION

In conclusion, the Defendant has not put forward sufficient evidence to make out a prima facie case under the Sixth Amendment, Fifth Amendment or JSSA.  The evidence fails to show

that Hispanics, Native Americans, African Americans or men are substantially underrepresented in either the grand or petit jury venires.  Therefore, the Defendant's Motion to Dismiss or, in the Alternative, Stay the Proceedings is DENIED.

_____
UNITED STATES DISTRICT JUDGE